# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

In re:

SALMON FALLS RESORT, LLC,

Debtor.

Case No. K09-00301-DMD

Chapter 11

**Filed On
10/22/09**

## MEMORANDUM REGARDING STAY RELIEF

Debtor Salmon Falls Resort, LLC, filed for chapter 11 relief on May 15, 2009. Al and Shirley White, through their corporation, Salmon Falls, Inc., moved for relief from stay on July 10, 2009. A final hearing on the motion for relief from stay was held in Ketchikan on September 28 and 29, 2009. For the reasons stated below, I will grant the Whites' motion for relief from stay.

Salmon Falls Resort is a fishing lodge located 17 miles north of Ketchikan. While it is on the Ketchikan road system, the City of Ketchikan itself is accessible only by air or sea. Steve Seley, a logger and developer from Ketchikan, originally built the facility. He sold it to the Whites in 1991. The Whites ran the resort from 1991 through December of 2003, when they sold it to Larry Olson, from Oregon. The purchase price was $10 million. Olson made a $3 million dollar down payment, and the Whites carried the balance. Olson decided not to keep the resort after operating it for one season. He returned it to the Whites in January of 2005. They operated the resort before selling it to the debtor for $12.5 million on March 10, 2007.

Ron LeGrand had been a long time customer of the resort. LeGrand is from Florida. He is a real estate developer and also teaches seminars on real estate. Through the years, LeGrand had talked about purchasing the resort from the Whites. Shirley White gave him a brochure for the resort, but refused to allow him access to the books or tax returns of the resort, however. She put LeGrand in contact with Paul Cyr and Chris Garmen, who were also interested in purchasing the resort. Together, they formed the debtor, Salmon Falls Resort, LLC. LeGrand owned 75% of the LLC, and Cyr and Garmen each owned 12.5%. LeGrand initially contributed $1.5 million in capital for the debtor. Cyr and Garmen contributed $250,000.00 each. Cyr and Garmen were to manage the resort.

Initially, the Whites agreed to sell the resort to Heritage Financial Group, a LeGrand entity. Their buy-sell agreement with Heritage was executed November 28, 2006.[1] It provided that the Whites would be secured by a deed of trust upon the resort's real property and a security interest in all its assets, which were listed on an attached exhibit.[2] The exhibit contained a detailed itemization of the boats, vehicles and other personal property to be transferred to the purchaser. An amended buy-sell agreement was executed March 10, 2007, which named the debtor as purchaser.[3] Except for the change of parties, the terms of the original buy-sell remained effective.

---

[1] Debtor's Ex. 2.

[2] *Id.* at 4, ¶ 3.

[3] Debtor's Ex. 3.

2

The debtor paid $2 million down, and executed a promissory note for the balance of $10.5 million.[4]  Interest on the principal balance accrued at 5% per annum.  The debtor was to make monthly, interest only payments and an annual payment of $500,000.00, in March of each year, towards principal reduction.  The entire balance was due and payable within ten years, but there were incentives for early payment of the obligation.  If the debtor paid the remaining balance within one year of purchase, it was to receive a 20% discount on the remaining purchase price.  If the remaining balance was paid in two years, the debtor was to receive a 10% discount on the purchase price.

The $10.5 million note was secured by a deed of trust on the Salmon Falls real property.[5]  The deed of trust was recorded on March 14, 2007.  It describes as collateral both the real property associated with the resort and the personal property listed in the exhibit to the buy-sell agreement. The Whites also recorded a UCC-1 financing statement which listed the personal property included in the sale.[6]  This document was recorded on February 18, 2009.  The listed personal property included four 52-passenger jet boats used for tours of the area by cruise ship passengers.  The Whites did not obtain preferred ship mortgages on the jet boats, however.

---

[4] Debtor's Ex. 4.

[5] Debtor's Ex. 5.

[6] Debtor's Ex. 13.

3

The debtor's financial performance has been poor under the LeGrand regime. According to the restated financial statement provided by the Whites' CPA, Diane Palmer, in 2007 the debtor grossed $2,375,444 and incurred a net loss of $640,242.[7] In 2008, the debtor grossed $2,363,209 and incurred a net loss of $1,815,097.[8] For the seven months ending on July 31, 2009, the debtor had gross income of $883,790 and a net loss of $988,574.[9] Palmer projects total gross income of just $1.5 to $1.6 million in 2009. The accuracy of this projection has now been substantiated by the debtor's most recent monthly financial report, which shows total gross income of $1,552,339.00 through Sept. 30, 2009, the end of the tourist season.[10]

Given the resort's lackluster performance over the past three years, the debtor has been unable to service the Whites' debt. LeGrand, Cyr and Garmen have sold portions of their equity interests to raise capital. LeGrand was forced to borrow $500,000 against his home to make the 2008 annual principal payment. The debtor defaulted on the interest-only payments in 2008 and the Whites started a deed of trust foreclosure in January of 2009. The Whites have received no principal or interest payments in 2009.

11 U.S.C. § 362(d)(1) provides that a court shall grant relief from stay "for cause, including the lack of adequate protection of an interest in property of such party in

---

[7] *See* Whites' Ex. MM at Ex. 3, p. 5.

[8] *Id.* at 6.

[9] Whites' Ex. MM at Ex. 4, p. 4.

[10] *See* Debtor's Sept., 2009, Monthly Report, filed Oct. 16, 2009 (Docket No. 101).

4

interest."[11] 11 U.S.C. § 362(d)(2) provides for stay relief if "the debtor does not have an equity in such property" and "such property is not necessary to an effective reorganization."[12] The provisions of subsections (d)(1) and (d)(2) are disjunctive; a creditor only needs to prove entitlement to relief under one section or the other, but not both.[13]

Circuit courts have recognized that stay litigation is narrow in scope. As stated by the Ninth Circuit:

> Stay litigation is limited to issues of the lack of adequate protection, the debtor's equity in the property, and the necessity of the property to an effective reorganization. Hearings on relief from the automatic stay are thus handled in a summary fashion. The validity of the claim or contract underlying the claim is not litigated during the hearing. The action seeking relief from the stay is not the assertion of a claim which would give rise to the right or obligation to assert a counterclaim.[14]

Similarly, the Fifth Circuit has noted:

> As a matter of law, the only issue properly and necessarily before a bankruptcy court during relief from stay proceedings is whether the movant creditor has a colorable claim; thus, a decision to lift the stay is not an adjudication of the validity or avoidability of the claim, but only a

---

[11] 11 U.S.C. § 362(d)(1).

[12] 11 U.S.C. § 362(d)(2).

[13] *Sun Valley Ranches, Inc. v. The Equitable Life Assurance Soc'y (In re Sun Valley Ranches, Inc.)*, 823 F.2d 1373, 1376 (9th Cir. 1987).

[14] *Johnson v. Righetti (In re Johnson),* 756 F.2d 738, 740 (9th Cir. 1985) (citations omitted).

> determination that the creditor's claim is sufficiently plausible to allow its prosecution elsewhere.[15]

The Seventh Circuit is consistent with the Ninth and Fifth Circuits on this point. In *Vitreous Steel Products,* it stated:

> As the bankruptcy court correctly stated, a hearing on a motion to lift the automatic stay under § 362(d) is limited in scope. Questions of the validity of liens are not generally at issue in a § 362 hearing, but only whether there is a *colorable* claim of a lien on property of the estate. . . . . [T]he only issues necessarily decided at the § 362 hearing were whether the Bank had a colorable claim of a lien and whether the amount of that lien exceeded the value of the property.[16]

The debtor has filed an adversary proceeding against the Whites and their corporation, Salmon Falls, Inc., seeking to avoid their security interest in the lodge personal property and the four jet boats. My decision here will not adjudicate the preference and strong-arm claims of the debtor. I believe that the Whites have established a colorable claim of lien to the jet boats and all other personal property transferred to the debtor. I will now address the issues which have been raised in the Whites' motion for relief from stay: adequate protection, the lack of equity in the property and the necessity of the property to an effective reorganization.

---

[15] *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 34 (1st Cir. 1994).

[16] *In the Matter of Vitreous Steel Prod. Co.,* 911 F.2d 1223, 1234 (7th Cir. 1990)(citations omitted, emphasis in original).

The purpose of adequate protection is to provide compensation to a creditor for a decline in the value of its secured claim during the course of bankruptcy proceedings.[17] Although there is controversy on the point, I believe the proper starting point for valuing collateral for adequate protection purposes is the date the motion seeking such relief was filed.[18] Here, the Whites sought relief from stay on July 10, 2009. The final hearing on their motion was held on September 28 and 29, 2009. To determine whether the Whites are adequately protected, the value of their collateral as of July 10, 2009, when their motion was filed, must be compared against the value of the collateral as of the date of the final hearing to find out if there has been a decline in value.[19] Although considerable testimony was given regarding the value of the resort's real and personal property as of September 28, 2009, no testimony was given to show a specific decline in value from July 10th to September 28th, 2009. Unquestionably, the debtor used and depreciated the Whites' personal property collateral over that time period. Diane Palmer's statement of the debtor's income and expenses for the seven month period ending July 31, 2009, shows depreciation and amortization expense of $630,824.[20] It is impossible for me to back out the amortization expense and come up with a monthly depreciation figure, however. Even if I could, there is a difference between depreciation for tax purposes and depreciation for adequate protection

---

[17] *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 370 (1988).

[18] *In re Cason,* 190 B.R. 917, 929 (Bankr. N.D.Ala. 1995).

[19] *Id.* at 931.

[20] Whites' Ex. MM, Ex. 4 at 4.

7

purposes. Depreciation for adequate protection purposes is the actual decline in fair market value of the collateral over a period of time, not the application of a straight line formula used in tax depreciation schedules. Because the Whites have failed to establish that their collateral has declined in value, relief from stay on adequate protection grounds cannot be granted.

The Whites also seek relief from stay under § 362(d)(2), however. Under this subsection, relief from stay can be granted if there is no equity in the property and such property is not necessary for an effective reorganization. The Whites have established the first prong, that there is no equity in their collateral. They hold a colorable secured claim as to all the resort assets which were sold to the debtor. Their security includes real property just outside of Ketchikan consisting of approximately 11 acres and 997.72 feet of ocean frontage, together with all improvements. The improvements include a 36-unit lodge building, a 16-unit lodge with laundry facilities, a restaurant with banquet room and office, a guest lounge, a gift shop, a water treatment building, a freezer building, and a tackle shop with an employee dormitory. There are extensive marine improvements consisting of ramps, piers and docks. The driveway and parking lots have been paved. There are furniture, fixtures and equipment for the rooms, the restaurant and bar. There are numerous boats, motors and skiffs used for fishing and four jet boats used in conjunction with cruise line visitors. The resort also owns vans, busses and other miscellaneous vehicles.

Kim Wold is an appraiser who previously appraised the resort for the Whites. He placed a value of $11 million on the resort in June of 2005. Wold testified that the present value of the real and personal property of Salmon Falls Resort is now $6 million. Wold was generally credible as to value but neglected to include one jet boat in his appraisal and was confused about other boats owned by the resort. He listed ten 26-foot "Rankin" cabin cruisers in his appraisal.[21] The debtor has six 26-foot 1983 Renken cabin cruisers. Wold also failed to include the ten 24-foot 2006 Skagit Orcas owned by the resort in his appraisal. The debtor scheduled the Orcas at $75,000 each, but listed the 1983 Renkens for just $25,000.00 each.

Wold's current appraisal is lower than Larry Olson's pending offer to again purchase the lodge for $10 million. As noted above, Olson purchased the resort from the Whites for $10 million in 2003. He paid $3 million down, operated the resort for a year, and then returned it to the Whites. Now, Olson is willing to again purchase the resort for $10 million. This time, the Whites are willing to sell to him with no down payment, carrying the purchase price at 5% interest over ten years. Because it is not a cash sale, Olson's present offer should be discounted. Nonetheless, Wold's current valuation of the lodge should be increased to reflect Olson's offer and include the boats Wold missed. I conclude that the present fair market value of Salmon Falls Resort is $8 million. The Whites' claim of

---

[21] Debtor's Ex. 14 at 35.

9

$10,276,041.47 is undersecured by over $2.2 million. Under 11 U.S.C. § 362(d)(2)(A), the debtor does not have an equity in the property secured to the Whites.

While two additional opinions regarding the value of Salmon Falls Resort were offered, I did not find either persuasive. Bill Bolling, a Ketchikan realtor, placed a value of $11 million on the resort. I did not give any weight to the findings found in his appraisal letter of May 28, 2009.[22] Bolling was simply parroting the views of Shirley White and conducted no independent research. His appraisal letter stated that he was "in general agreement" with Shirley White's estimate of value and that he had not used any commonly accepted appraisal techniques or inspected the property in arriving at his value.[23] Nor did I give any weight to the Whites' Exhibit "S," a June, 2008, appraisal from Integra Realty Resources which values the lodge at $14.7 million as a fishing resort and $37.760 million as a membership club. In light of the dramatic downturn in the national economy, this appraisal, more than a year old, was not credible.

The second prong of § 362(d)(2)(B) requires a finding that the property is not necessary to an effective reorganization. As stated by the Supreme Court:

> Once the movant under § 362(d)(2) establishes that he is an undersecured creditor, it is the burden of the *debtor* to establish that the collateral at issue is "necessary to an effective reorganization." What this requires is not merely a showing that if there is conceivably to be an

---

[22] Whites' Ex. P at 2.

[23] *Id.*

10

>   effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*. This means, as many lower courts, including the en banc court in this case, have properly said, that there must be "a reasonable possibility of a successful reorganization within a reasonable time."[24]

Here, the debtor has failed to make this showing.

Ron LeGrand is the debtor's primary mover and shaker. He's invested over $2 million in the debtor. LeGrand has no realistic ideas for crawling out of the huge hole he's dug for himself and the debtor. His efforts to create a membership club at the resort have failed. He claims to know people who know people knowledgeable about time-share and fractional interest sales. He also knows of a company called "L.A. Capital" that looks for capital for real estate projects. Yet none of those people or entities appeared at the hearing to corroborate LeGrand's visions for the resort. LeGrand has failed to establish any rational plan to save the debtor.

LeGrand and his partners submitted a five year forecast of income and expenses to Kim Wold for use in preparing his current appraisal for the resort.[25] The projections in that forecast are simply ludicrous. They project gross income of $4.161 million in 2010, with net income of $2 million plus. The income projections increase annually, reaching more than $5 million of gross income in 2014 with net income of nearly

---

[24] *Timbers of Inwood*, 484 U.S. at 375-376 (citations omitted, emphasis in original).

[25] Debtor's Ex. 14 at 95.

11

$2.4 million. Coming from a company that has failed to *gross* $1.6 million by the close of the season in 2009, there is no basis for such numbers.[26] The projections represent irrational exuberance taken to an extreme. There is no reorganization in prospect for such an enterprise.

Wold's projections are more conservative, but remain flawed. In his defense, Wold was given historic accounting information regarding the resort that was inaccurate. Using Diane Palmer's restated income numbers for 2007,[27] the debtor actually had a substantial amount of net operating income to service long term debt. I came up with $489,409 available for debt service in 2007. The debtor claimed $404,340 in net operating income for the same year.[28] 2008 was a very bad year. The debtor showed just $697 in net operating income.[29] Using Diane Palmer's restated numbers from her 2008 income statement,[30] the debtor actually had negative net operating income of $225,456. That is a remarkable negative turnaround given that the gross income of the resort stayed at a relatively constant level: $2.375 million for 2007 and $2.363 million in 2008.[31] For the first

---

[26] *See* Debtor's Sept., 2009, Monthly Report, filed Oct. 16, 2009 (Docket No. 101).

[27] Whites' Ex. MM at Ex. 3, p. 5.

[28] Debtor's Ex. 14 at 94.

[29] *Id.*

[30] White's Ex. MM at Ex. 3, p. 6.

[31] *Id.* at 5-6.

12

seven months of 2009, the debtor shows negative operating income of $165,700.[32] Diane Palmer shows negative net operating income of $66,428.[33] The corrected historic numbers for 2008 and the first seven months of 2009 indicate that the debtor is incapable of paying any long term debt whatsoever.

Despite those grim numbers, Wold projects that the debtor will return to producing positive net operating income from 2010 through 2014.[34] He predicts net operating income of $321,330 in 2010, climbing to $808,436 in 2014. I think his projections are overly optimistic. He predicts gross income of $2.4 million in 2010, even though the number of cruise ship passengers stopping in Ketchikan is expected to decrease by 113,000 next year. Moreover, with nationwide unemployment hovering near 10%, the economic recovery has not filtered down to the general populace of the country. Demand for luxury items such as vacations at remote fishing resorts will remain low in 2010. I can't foresee an $800,000 increase in 2010 income under such circumstances.

Additionally, Wold has understated the debtor's expenses. Diane Palmer identified ten different expense categories where he understated expenses based on historical data.[35] Even if I were to overlook these deficiencies, the projected funds available for debt service are inadequate. Amortizing the Whites' $8 million secured claim over a ten year

---

[32] Debtor's Ex. 14 at 94.

[33] Whites' Ex. MM at Ex. 4, p. 4.

[34] Debtor's Ex. 14 at 96.

[35] Whites' Ex. LL, Supplemental Report #1 at 9.

13

term, at a very conservative 5% cramdown interest rate, requires more than $1 million a year for debt service. Amortizing the Whites' $2.2 million unsecured claim over ten years at 5% would require an additional $280,000 annually. These payments cannot be made. The best year under Wold's projections, 2014, would produce just $808,436 of operating income.[36] Even if the payments were stretched to fifteen years at 5%, the debt service payments would come to $968,000 a year, an impossible sum for the debtor. I conclude that, under the Wold projections, there is no viable plan of reorganization that is in prospect for this debtor.

      Despite these problems, the debtor argues that it's early in the case and a reasonable possibility of reorganization in a reasonable period of time exists. I respectfully disagree. Since purchasing the resort, the debtor has had three full operating seasons to get the business underway. Barring a miracle, or an extraordinary upsurge in the economy, nothing fundamental is going to change by giving the debtor more time. The debtor lacks the ability to service its debt. The current management is incapable of generating the profits needed to successfully reorganize. Those facts won't change by giving the debtor more time.

      In its opposition to the relief from stay motion, the debtor strongly argues the merits of its avoidance claims as to the Whites' security interest in the debtor's personal property. These claims are the subject of Adversary No. K09-90021-DMD, *Salmon Falls Resort, LLC, v. Salmon Falls, Inc.* Even if the debtor prevailed on its avoidance claims,

---

[36] Debtor's Ex. 14 at 96.

14

however, it would still have to pay the Whites the present value of their unsecured claim.[37] Given the debtor's financial performance to date, it is incapable of doing so.

For the foregoing reasons, the motion for relief from stay filed on July 10, 2009, by Salmon Falls, Inc., will be granted in its entirety. An order and judgment will be entered, granting relief from stay as to all real and personal property transferred to the debtor, including the four jet boats.

DATED: October 22, 2009.

BY THE COURT

/s/ Donald MacDonald IV
DONALD MacDONALD IV
United States Bankruptcy Judge

Serve: D. Bruce, Esq.
F. Odsen, Esq.
K. Hill, Esq.

10/22/09

---

[37] 11 U.S.C. § 1129(b)(2)(B)(i).

15